UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DONALD RUSSELL, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 17-664 |
| v. | : | OPINION |
| FEDEX GROUND, et al., | : | |
| Defendants. | : | |

This matter is before the Court on a motion for summary judgment filed by Defendant FedEx Ground Package Systems, Inc. (incorrectly captioned originally as FedEx Ground). Having considered the parties' submissions, the Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated below, this Court grants Defendant's motion for summary judgment.

## Background

Plaintiff Donald Russell, who is African-American, was employed by Defendant from June 11, 2007 until his termination on or about April 29, 2016. At the time of his termination, Plaintiff was an Operations Manager at the FedEx Ground location in Barrington, New Jersey. His immediate supervisor was Sort Manager Keith Davis, who is also African-American. Davis reported to Assistant Senior Manager Pete Adams, who in turn reported to Timothy Norton, the senior manager of the facility.

In October of 2015, Adams allegedly engaged in a verbal altercation with Plaintiff. Prior to this incident, Adams had commented that Plaintiff's car and a vacation he took must have been expensive. Plaintiff interpreted these comments as racially motivated. Soon after the October 2015 incident, another employee advised Plaintiff that Adams remarked about Plaintiff, "I can't stand that nigger, I'm going to get his black ass."

Plaintiff allegedly reported the comment to Norton. After doing so, Plaintiff received allegedly unwarranted disciplines. Plaintiff complained to a human resources manager, Edward Donahue, who is African-American, that he believed he was being retaliated against; Donahue left Defendant's employ "a few weeks later," on or about August 4, 2015. On January 7, 2016, Plaintiff was placed on a 90-day Performance Improvement Plan ("PIP"), administered by Davis. In February of 2016, Plaintiff allegedly again complained to human resources, this time to Mandy Knight, also African-American. Plaintiff was terminated on April 29, 2016 for alleged performance issues.

In this case, Plaintiff asserts claims for racial harassment in violation of NJLAD, retaliatory harassment in violation of NJLAD, retaliatory discharge in violation of NJLAD, and a request for equitable relief.

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party

cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); *accord* Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## NJLAD

The NJLAD "was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination, where the NJLAD declares that the opportunity to gain employment without fear of discrimination is a civil right." *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 534 (D.N.J. 2008); *see Fuchilla v. Layman*, 537 A.2d 652, 660 (N.J. 1988) ("[T]he overarching goal of the [NJLAD] is nothing less than the eradication 'of the cancer of discrimination.'") (quoting *Jackson v. Concord Co.*, 253 A.2d 793, 799 (N.J. 1969)).

The New Jersey Supreme Court has explained that the NJLAD is broad remedial legislation, designed to prohibit employers from discriminating against employees with respect to the terms and conditions

5

of their employment on the basis of a protected characteristic, such as race, religion, age, sex, and disability. *See Quinlan v. Curtiss-Wright Corp.*, 8 A.3d 209, 220 (N.J. 2010) ("We have been vigilant in interpreting the [NJLAD] in accordance with that overarching purpose, and in recognition that it is . . . remedial legislation that was intended to be given a broad and liberal interpretation."); see also N.J. Stat. Ann. § 10:5-12(a) (listing the various protected classes under the NJLAD).

Workplace discrimination claims brought under the NJLAD are analyzed under the flexible burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Viscik v. Fowler Equipment Co.*, 800 A.2d 826 (N.J. 2002) (adopting *McDonnell Douglas* framework for NJLAD employment discrimination cases). Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination by pointing to evidence in the record sufficient to create a genuine factual dispute that "s/he suffered an adverse employment action . . . under circumstances that could give rise to an inference of intentional discrimination" on the basis of race. *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008); *accord Iadimarco v. Runyon,* 190 F.3d 151, 163 (3d Cir. 1999) (requiring plaintiff who alleges reverse race discrimination to present

"sufficient evidence to allow a reasonable fact finder to conclude . . . that the defendant treated [plaintiff] less favorably than others because of his race").

The oft-cited elements of a *prima facie* case of racial discrimination are that a plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999). Similarly, to establish a *prima facie* case of retaliation under the NJLAD, a plaintiff must show: (1) he belonged to a protected class; (2) he engaged in protected activity, which was known to the employer; (3) he was subjected to an adverse employment consequence; and (4) a causal link exists between the protected activity and the adverse employment consequence. *Victor v. State,* 4 A.3d 126, 141 (N.J. 2010). To assess causation, in addition to looking at temporal proximity, the Court must consider "with a careful eye . . . the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000).

If a plaintiff makes out a *prima facie* case, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for

its employment decision. *McDonnell Douglas*, 411 U.S. at 802-03. If the employer meets its burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for the adverse employment action was pretextual. *Id.* To establish pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication," or (2) present evidence sufficient to support an inference that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994). To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Id.* at 765.

"When a black plaintiff alleges hostile work environment racial harassment under the LAD, []he must demonstrate that the defendant's 'conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" *Caver v. City*

*of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (citing *Taylor v. Metzger,* 706 A.2d 685, 688-89 (N.J. 1998) (quoting *Lehmann v. Toys 'R' Us, Inc.,* 626 A.2d 445, 453 (N.J.1993)) (modifications in original)). "'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver*, 420 F.3d at 262 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). "Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment . . . .'" *Id.* In determining whether the conduct at issue is sufficiently extreme, the Court must consider the "totality of the circumstances." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir. 1990). "The types of circumstances we consider 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Caver*, 420 F.3d at 262-63 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

## Discussion

As outlined above, Plaintiff bases his discrimination claim on three incidents: (1) Adams' comment on the cost of Plaintiff's new Jeep Wrangler; (2) Adams' comment on the cost of Plaintiff's February 2015 10-day

Mediterranean vacation; and (3) Adams allegedly told another employee, "I can't stand that nigger, I'm going to get his black ass."

Plaintiff concedes that race was never mentioned in any conversation he had with Adams. He imputed race into the two comments Adams made to him because "by the way he said it to me, it led me to believe that a black person shouldn't be able to afford [it]." (Pl. Dep., 18:6-8.)

According to Plaintiff, sometime is 2015[1] Plaintiff drive his vehicle, a brand new $40,000 Jeep Wrangler, inside the station after coming back from the supermarket with food and beverages for a staff meeting.  Plaintiff says Adams commented on how expensive and nice it was, which Plaintiff interpreted as racist:

> *So when I got out of the car he was like, "Wow, that's a nice car.  That car must be pretty expensive."  He was like, "My car don't even cost that much."  I didn't really know what to say so I just said like "Okay," but in my mind I didn't see the relevance.  So what difference does it make what kind of car I'm driving or how much it costs, you know.  But the way he said it to me, you know, it led me to believe that a black person shouldn't be able to afford a car like that.*

(Pl. Dep., 17:25-18:8.)

---

[1] Plaintiff testified at his deposition that Adams' comments about his vacation took place in February 2015, and that he was "not really sure" whether the comment about his vehicle took place before or after that.  (Pl. Dep., 19:20-25.)

In February 2015, shortly after Plaintiff returned from a 10-day overseas vacation with his wife, Adams made the second comment which Plaintiff relies on for his harassment claim:

> *The comment about the vacation was in February of 2015, and I know this for certain because it was a trip me and my wife took for our 25th wedding anniversary that we had been saving up for five years for so that we could go. . . So when I came back from my trip he was like, "Oh, I heard you went on a Mediterranean cruise. I heard you was in Italy." And stuff like that. He said, "That must have been pretty expensive." He said, "Even I've never even been to Italy." So then again, I'm like why is this guy saying things to me about money and finances, you know, like alluding to the fact that I'm living a better life that I should be living. I mean, why should I not be able to go on vacation wherever I want to go? I been saving for it for view years so what difference does it matter where I went and how much it costs.*

(Pl. Dep., 18:18-19:10.)

When asked if Adams said anything else during either of these two incidents that led him to infer racial animus, Plaintiff confirmed he did not:

> *Q: Have you told me everything about the comment he made about your car and the comment he made about your vacation in the very greatest detail that you can recall?*
> *A: Yes.*

(Pl. Dep., 20:9-12.)

> *Q: So when he commented on your Jeep Wrangler and he said, "Wow, that's an expensive car, that's*

> *really nice," and when he said, "Wow, that some great vacation you went on, I've never been to Italy, that's something," you took those comments as racially motivated, is that correct?*
> *A: Yes.*
> *Q: Did he ever mention your race?*
> *A: Not to me, personally.*
> *Q: When made the comment about your Jeep Wrangler and your vacation, can we agree that he never mentioned your race?*
> *A: Yes.*

(Pl. Dep., 22:15-23:3.)

When asked if Plaintiff ever heard Adams comment on his race – or on anyone's race – during the entire time they worked together, Plaintiff confirmed he had not.

> *Q: In that time frame had you ever heard him make any comment about your race?*
> *A: Again, not to my face.*

(Pl. Dep., 23:14-16.)

> *Q: So there were a lot of African-American in the station; is that correct?*
> *A: Yes.*
> *Q: In the time frame that you worked with Pete Adams you indicated that he never mentioned your race before to you. Had you ever heard him mention anyone's race?*
> *A: Not to me, no.*
> *Q: But on this occasion when he commented on your vehicle being really nice and your vacation being a pretty fancy vacation, on those occasions you assumed he was commenting on – he was making a racial comment?*
> *A: Yes.*

12

(Pl. Dep., 24:12-23.)

The third comment was not made to Plaintiff himself. Rather Plaintiff asserts that Adams made the derogatory comment to Brian Flem, who then told Marjorie Jones, who told Francine Winthers, who informed Plaintiff.

> *Q: You said that you were advised by at least one other employee in the facility that Mr. Adams was telling people, "I can't stand that N-word. I'm going to get his ---"*
> *Plaintiff's Counsel: "Black ass," you can say it.*
> *Q: Who was that one other employee in the facility that advised you of this?*
> *A: Francine Winthers.*
> *Q: And please tell me everything that you can recall in the greatest detail you can about what she said to you.*
> *A: "… And basically what she did was she came to me and she said, "Donald," she said, "Be careful, watch your back because Pete doesn't like you. Pete is out to get you," and it got back to her that he called me a nigger and that he said he couldn't stand my black ass and that he was going to get me, that's exactly what she told me.*
> *Q: Did she hear Pet Adams ever way those words?*
> *A: I don't believe she heard it because, again, she's African-American so. The comments were made to another white manager.*
> *Q: And ---*
> *A: And it just so happens that the other white manager, me and him were friends, and obviously he didn't like the situation, what Pete said, because it got back to me through Francine.*
> *Q: Who was this white manager that you claim Pete Adams made that comment to?*
> *A: Brian Flem.*

> *Q: So, it's your testimony that he made that comment "I can't stand that N-word, I'm going to get his black ass," he made that comment to Brian Flem?*
> *A: Yes.*
> *Q: Did Brian Flem tell you that?*
> *A: No.*
> *Q: Well, did Brin Flem tell Francine that?*
> *A: No. Brian Flem told Marjorie Jones.*
> *Q: So is it your testimony that Francine Winthers told you that she had heard from Marjorie Jones who had heard from Brian Flem –*
> *A: Yes.*
> *Q: -- that Pete Adams made those comments?*
> *A: Yes.*
> *Q: Okay, and just so that the record is clear because it can get a little confusing, is it your testimony that that comment, "I can's stand that N-word, I'm going to get his black ass," was made from Pete Adams to Brian Flem who then told Marjorie Jones who then told Francine Winthers who then told you?"*
> *A: Yes.*
> *Q: Have you told me everything about the comments that Pete Adams supposedly made and the people that he made it to in the very greatest detail that you can recall?*
> *A: Yes.*
> *Q: Are you aware of anyone in the station that heard Pete Adams make that comment, other than what you've just testified to?*
> *A: No.*

(Pl. Dep., 33:5-36:1.) However, each of these individuals denies this.

As testified by Pete Adams:

> *Q: And when you were there, did you ever refer to Donald Russell as a nigger?*
> *A: No.*

14

> *Q: Okay. Did you ever use words to the effect that you were going to get his black ass, referring to Donald Russell?*
> *A: No.*
> *Q: Have you ever used racially derogatory language at work?*
> *A: No.*
> *Q: Have you ever used the word nigger at work?*
> *A: No.*

(Adams Dep., 13:9-22.)

Brian Flem was also deposed:

> *Q: At any point have you ever told Marjorie Jones that Pete Adams referred to Mr. Russell as a nigger?*
> *A: No.*
> *Q: Okay. Did Pete Adams ever refer to Mr. Russell as a nigger when talking to you?*
> *A: Not in my presence.*
> *Q: Okay. Did anyone ever tell you that Mr. Adams had referred to Mr. Russell as a nigger?*
> *A: No.*
> *Q: Okay. Have you ever heard Pete Adams use the work nigger at work?*
> *A: No.*
> *Q: Have you ever heard Mr. Adams use any racially derogatory language at work?*
> *A: Not racially. Stupid, idiot, referring to people, Not one on one, but as a group.*
> *Q: Okay.*
> *A: Staff meeting, misload meetings that they've had, but never anything derogatory.*
> *Q: Not derogatory of a specific race?*
> *A: Correct.*
> *Q: Did Mr. Adams ever tell you in reference to Donald Russell that he couldn't stand that nigger and was going to get his black ass?*
> *A: No. I have very minimal conversations with Mr. Adams.*

(Flem Dep., 17:3-18:10.)

Marjorie Jones corroborated as follows:

> *Q: Okay. Did Brian Flem ever tell you that Pete Adams had used racially derogatory language about Mr. Russell?*
> *A: No.*
> *Q: Did Mr. Flem ever tell you that Pete Adams had referred to Donald Russell as a nigger?*
> *A: No.*
> *Q: Did Mr. Flem ever tell you that Pete Adams said that he was going to ger his black ass, referring to Mr. Russell?*
> *A: No.*
> *Q: Did you ever tell Mr. Russell that Mr. Flem had said those things to you?*
> *A: No.*
> *Q: Okay. Did you ever tell Mr. Russell anyone had used racially derogatory language about him?*
> *A: No.*
> *Q: Did you ever hear Pete Adams use racially derogatory language?*
> *A: No.*
> *\* \* \**
> *Q: Did you ever tell Francine Winthers that Pete Adams or anyone else had used racially derogatory language about Donald Russell?*
> *A: No.*

(Jones Dep., 16:7-17:4; 19:7-11.)

Finally, Francine Winthers denies that she told Plaintiff about the derogatory remark:

> *Q: Okay. And did you resign or were you terminated?*
> *A: Resigned.*

> *Q: Okay. And was Mr. Russell someone that you had any sort of social relationship with outside work?*
> *A: Yes.*
> *Q: Okay. Were you friends?*
> *A: Yes.*
> *Q: Okay. Are you still friends with him today?*
> *A: Yes.*
> *Q: Did he tell you why he was suing FedEx?*
> *A: Yes.*
> *Q: What did he say?*
> *A: Wrongful termination.*
> *Q: Okay. During the course of your employment with FedEx, did anyone ever tell you that Pete Adams had referred to Donald Russell as a nigger?*
> *A: No. He didn't use that word.*
> *Q: Okay. What was said?*
> *A: He said look at him, I can't stand him walking around here like he thinks he owns something. I'm going to get rid of him.*
> *Q: Okay. Did you ever say to Mr. Russell that Brian [Flem] claimed that Pete had called him a nigger?*
> *A: No.*
> *Q: Okay. Did you ever hear from anybody that Pete Adams had used any racially derogatory language about Mr. Russell or anyone else at FedEx?*
> *A: No. I didn't.*

(Winthers Dep., 11:8-12:3; 12:20-13:9; 14:4-21.)

Even viewed as a whole, these three alleged circumstances cannot form the basis of a hostile work environment claim. Two of the three comments were non-racial and not so severe or pervasive as to alter the conditions of Plaintiff's employment. The third constitutes an unsworn

17

hearsay statement, which would be inadmissible at trial and therefore is insufficient to defeat a motion for summary judgment. *See Boyle v. Penn Dental Med.*, 689 F. App'x 140, 144 (3d Cir. 2017); *Garcia v. Newtown Twp.*, 483 F. App'x 697, 704 (3d Cir. 2012); *Bristol v.* Settle, 457 F. App'x 202, 204 (3d Cir. 2012); *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

Regarding alleged retaliation, there is no support in the record for a causal link between any complaints Plaintiff may have made and his PIP or termination. In contrast, Defendant has thorough documentation of its reasons for terminating Plaintiff for inadequate performance during his 90-day PIP.

First, an employer's decision to place an employee on a PIP does not itself constitute an adverse employment action when the PIP is comprised of directives relating to the employee's preexisting responsibilities. *Reynolds v. Dep't of the Army*, 439 F. App'x 150 (3d Cir. 2011). Next, Plaintiff was placed on a PIP approximately six months after complaining to Donahue, which would mean that his PIP was put in place over six months after he allegedly complained to Norton. Accordingly, the Court finds no temporal proximity between any complaints Plaintiff may have made and his PIP to infer retaliatory harassment.

As to the claim of retaliatory discharge, Plaintiff's performance deficiencies appear to have given Defendant a legitimate, nondiscriminatory basis for his termination. Areas targeted as needing improvement included: providing timely responses to supervisors' questions, completing daily tasks, meeting deadlines, properly filing damaged package reports, meeting total labor hour goals, and missing misload metrics. Davis noted that Plaintiff achieved his metric scanning goal, but otherwise "did not meet or exceed the expectations set for him. " Further, Plaintiff "did not take the time out to develop himself during the PIP or spend additional time with his direct manager to improve throughout the PIP." In response, Plaintiff has failed to show that the reasons advanced by Defendant for his termination were a pretext for discrimination.

Finally, as discussed here, there are no grounds for this Court to issue a declaratory judgment to the effect that any practices of the Defendant violated New Jersey law.

## Conclusion

For these reasons, Defendant's motion for summary judgment will be granted. An appropriate Order will accompany this Opinion.

Dated: March 20, 2019  /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.